2020 UT App 76

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LORENZO M. FLOREZ,
Appellant.

Opinion
No. 20180827-CA
Filed May 14, 2020

Eighth District Court, Vernal Department
The Honorable Clark A. McClellan
No. 171800830

Emily Adams, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES KATE APPLEBY and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1      An elderly woman (Victim) discovered Lorenzo M. Florez at her back door, apparently trying to break into her house. Police soon arrived, and a jury later convicted Florez of four crimes, including attempted burglary (a third-degree felony) and criminal trespass (a misdemeanor). Florez appeals those two convictions, asserting that insufficient evidence supported his conviction for attempted burglary, and that the trial court erred by denying his request for a lesser-included-offense instruction. In addition to the issues he raises on direct appeal, Florez has also filed a motion, under rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case for additional proceedings as necessary to supplement the record to support a claim that Florez's trial counsel was ineffective for failing to

investigate potential key witnesses. We reject Florez's arguments regarding sufficiency of the evidence and regarding the lesser-included-offense instruction. But we find merit in Florez's rule 23B motion, and we therefore remand this matter for further proceedings concerning that motion.

## BACKGROUND

¶2    On a Christmas Eve morning, Victim—a ninety-two-year-old widow who lived alone—was taking a phone call on the upper level of her house in Vernal, Utah. Victim's backyard was surrounded by a fence that was at least four feet high and—having always felt safe in her neighborhood—she kept the gate closed, but never locked. After completing her phone call, she made her way down the stairs and, upon reaching the main level, she heard an unexpected noise, which was coming from the back door of her house. She turned to investigate, and saw a man at the back door who was actively trying to pick the lock on the outer door, using a "piece of wire." Later, at trial, Victim identified Florez as the man she saw at her back door.

¶3    Victim's back door had both a regular door and a storm door, which was a "pretty heavy door with bars going all the way through it, plus the glass and a screen." Victim opened the regular door, but not the storm door, and confronted Florez, telling him through the glass to "leave, go away." Florez looked at Victim briefly, and—without saying a word—persisted in his efforts to pick the lock.

¶4    Victim then called her neighbor (Neighbor) and explained the situation, and soon Neighbor and her son (Son) arrived at Victim's house. Neighbor also saw someone "with a wire" who was "trying to jimmy the lock and get into [Victim's] house." Neighbor went to the door and shouted "Hey[!]" at Florez, who did not respond, but "just kept trying to jimmy the lock." Neighbor then called the police.

¶5 As the police were en route, Victim and her neighbors remained in the house, with Son guarding the door and watching Florez. At some point before the police arrived, Florez—unprompted—stepped away from the storm door, backed down the patio steps, and put his hands on his head.

¶6 About two minutes later, a police officer (Officer) arrived and approached Florez, who was still standing on the back patio, "fiddling around with something that was in his hands." Officer identified himself and, twice, asked Florez to show his hands, but Florez "didn't respond at all" and just "looked basically right through" Officer. Later, Officer testified that Florez's behavior was consistent with that of an intoxicated person, though Officer did not conduct any field sobriety tests or other impairment investigation. Officer then placed Florez in handcuffs, and removed an object from Florez's hand, which turned out to be a sprinkler head that Florez apparently had broken off of the irrigation system in Victim's backyard. Florez did not have any other items on his person, but police later found a wire—taken from the sprinkler head Florez had been holding—on a nearby table, and also observed damage to the lock on the storm door.

¶7 After placing Florez in handcuffs, Officer ordered Florez to separate his feet to facilitate a search for weapons, but Florez once again did not comply, so Officer "helped [Florez] separate his feet." Officer asked Florez what his name was, to which Florez responded that he was a "federal agent." Officer then placed Florez in the back seat of his patrol car, where Florez eventually shared his correct legal name, date of birth, and social security number; when Officer checked that information in his police database, he discovered two outstanding warrants for Florez's arrest. However, when Officer asked Florez to state his current residence address, Florez gave Victim's home address. When the Officer pressed Florez a second time, Florez again claimed that he resided at Victim's address. After Officer again

expressed skepticism, Florez stated, "Well, I don't know where my address is, then." Officer then arrested Florez. During the booking process that followed, Florez again maintained that he was a federal agent.

¶8     After investigating the matter, the State charged Florez with four crimes: (1) criminal mischief, a class B misdemeanor, for breaking Victim's sprinkler; (2) attempted burglary, a third-degree felony, for attempting to break into Victim's house; (3) criminal trespass, a class A misdemeanor, for trespassing on Victim's property; and (4) impersonating a peace officer, a class B misdemeanor, for claiming to be a federal agent. After a preliminary hearing, the court bound Florez over for trial on all four charges, although prior to trial it amended the bindover on the criminal trespass charge down to a class B misdemeanor.

¶9     The case proceeded to a jury trial. During its case-in-chief, the State called four witnesses—Victim, Neighbor, Son, and Officer—who gave testimony outlining the events described above. Florez's counsel cross-examined all of the State's witnesses, but Florez called no witnesses of his own and chose not to testify on his own behalf. During cross-examination of Officer, Florez's counsel inquired whether Florez was "a suspect" in other "events" that took place the same day as the attempted break-in at Victim's house, and Officer answered in the affirmative. Florez's counsel then asked Officer to recount the nature of those other events, as described in his police report, but the State lodged a hearsay objection, which the court sustained, and Florez's counsel was therefore unable to further question Officer about those events.

¶10    At the close of the State's evidence, Florez's counsel moved for a directed verdict on the attempted burglary charge. The motion in its entirety consisted of a single statement: "I guess my position right now would be to make a directed verdict [motion] based on the burglary, attempted burglary, ask

the Court for a directed verdict. There's absolutely no evidence that could rise beyond a reasonable doubt on that count." The court denied the motion, discussing for a moment the question of how a factfinder might ascertain a burglar's criminal intent, and concluding that "there is evidence here" from which "a jury could infer" that Florez's "intent . . . to try to get into the residence was to take something or to do something other than commit a misdemeanor offense."

¶11 In addition to the directed verdict motion, Florez also asked the court for a lesser-included-offense instruction regarding the attempted burglary charge. Specifically, Florez wanted the court to instruct the jury that, on that charge, it could instead find him guilty of class A misdemeanor criminal trespass, which Florez argued was a lesser-included offense to attempted burglary. After some discussion, the trial court appeared poised to grant Florez's request and give the lesser-included-offense instruction. But the State then made an additional argument, pointing out that—given Florez's chief defense that, at the time, he was intoxicated and genuinely believed Victim's house was his, and therefore could not have had the requisite intent to enter the property illegally—there was no factual basis in the record for the jury to convict Florez of criminal trespass but acquit him of attempted burglary, because Florez's defense, if believed, would absolve him of both crimes. In response, Florez's counsel did not take issue with the State's assumption that Florez's chief defense was lack of mens rea for either crime, and did not offer the court any scenario under which Florez might be convicted of class A criminal trespass but acquitted of attempted burglary. The court then determined that it would not give the instruction Florez requested.

¶12 During closing argument, Florez's counsel asked the jury to find Florez not guilty, arguing that Florez did not have the requisite mental state to have committed the charged crimes. Much of counsel's argument centered around the assertion that

Florez could not have had the mens rea to have committed any crime, but at one point counsel argued to the jury—even though he had not made any such argument to the court, during the jury instruction conference—that "other circumstantial evidence suggests that [Florez's] actions would have been to annoy, not to assault, [to] assert he was a federal agent, not to steal, not commit a felony or any other action that would constitute a burglary." Following closing argument, the case went to the jury, which found Florez guilty as charged on all four counts.

¶13  Following the trial, Florez obtained different counsel, and in preparation for this appeal, the new attorney's office investigated the other "events," in which Florez was considered a "suspect," that occurred on the same morning as the attempted break-in of Victim's house. Working from Officer's police report, an investigator located a witness to these previous events (Witness). Witness lives in the same neighborhood as Victim. In a sworn declaration submitted to this court in connection with Florez's rule 23B motion, Witness avers that, on the same morning Florez was present in Victim's backyard, a man who appeared to be "on drugs" knocked on Witness's front door. After Witness opened the door, the man pushed past him, asking Witness several times if Witness was "the feds." After spending a short time inside, the man left Witness's house of his own accord, and Witness then saw the man barge into another nearby house and stay inside for under a minute, and heard the man loudly ask the occupants of the other house if they were "the feds." Witness then observed the man leave the nearby house voluntarily and then run off "down the street." The occupants of the other house emerged, and reported to Witness, consistent with his own observations, that "a crazy guy had entered their home, asked them if they were the feds, and left." Police soon arrived, and interviewed Witness. Witness claims in his affidavit that he was prepared to testify to these facts in the event he was called as a witness at trial.

ISSUES AND STANDARDS OF REVIEW

¶14    Florez now appeals his convictions for attempted burglary and criminal trespass,[1] and asks us to consider two issues in connection with the direct appeal.[2] First, Florez appeals

---

1. Florez does not appeal his class B misdemeanor convictions for criminal mischief and impersonating a peace officer.

2. Florez raises two additional issues concerning his criminal trespass conviction. First, he contends that his trial counsel rendered ineffective assistance by not asking the trial court to merge his conviction for criminal trespass into his conviction for attempted burglary. Second, he asks us, pursuant to rule 22(e) of the Utah Rules of Criminal Procedure, to correct his sentence on the criminal trespass count, pointing out that he was convicted of a class A misdemeanor despite the fact that the trial court only bound over the charge as a class B misdemeanor. The State concedes this second point. Florez argues that, if we reverse his attempted burglary conviction, we should take the second path, and reduce his criminal trespass conviction to a class B misdemeanor, but if we affirm that conviction, we should take the first path, and merge his criminal trespass conviction into his attempted burglary conviction. Because we reject Florez's first two arguments on direct appeal, but grant Florez's rule 23B motion, our ultimate decision about whether to affirm or reverse the attempted burglary conviction remains outstanding, and we therefore elect to defer any decision on his remaining two arguments until after remand. *See, e.g., State v. Griffin*, 2015 UT 18, ¶¶ 11, 57, 441 P.3d 1166 (staying a ruling on appellant's direct appeal "pending the outcome of the trial court proceeding" on rule 23B remand). By contrast, we reach the other two issues raised in Florez's direct appeal—regarding the denial of the directed verdict motion and the lesser-included-offense instruction—because if Florez had been correct about the

(continued…)

the denial of his directed verdict motion, arguing that there was insufficient evidence for the jury to conclude that he had the requisite intent to commit burglary. Where the denial of a directed verdict motion is at issue, we uphold the trial court's decision if we "conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Salgado*, 2018 UT App 139, ¶ 30, 427 P.3d 1228 (quotation simplified).

¶15 Second, Florez appeals the trial court's refusal to grant a lesser-included-offense instruction. "A trial court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness." *State v. Reece*, 2015 UT 45, ¶ 16, 349 P.3d 712 (quotation simplified).

¶16 In addition to the issues raised on direct appeal, Florez has also filed a motion under rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court in order to give him an opportunity to supplement the record with evidence to support a claim that his trial counsel provided ineffective assistance on the attempted burglary charge. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *See State v. Popp*, 2019 UT App 173, ¶ 20, 453 P.3d 657 (quotation simplified).

---

(…continued)

directed verdict issue, that would have resulted in dismissal of the attempted burglary charge (an eventuality that would have rendered the rule 23B motion moot), and because the analysis regarding the lesser-included-offense instruction is relevant to the rule 23B discussion that follows.

ANALYSIS

I

¶17    Florez first appeals the denial of his directed verdict motion on the attempted burglary charge, arguing that the State failed to prove beyond a reasonable doubt that Florez had the requisite intent to commit burglary. Under Utah law, a person cannot be convicted of burglary unless the State proves that a person both (a) "enter[ed] or remain[ed] unlawfully in a building," and (b) did so with the "intent to commit" a felony, theft, assault, lewdness, sexual battery, or voyeurism. *See* Utah Code Ann. § 76-6-202(1) (LexisNexis 2017); *see also State v. Johnson*, 771 P.2d 1071, 1072 (Utah 1989) ("A person is guilty of burglary if he or she (1) enters or remains unlawfully in a building (2) with intent to commit a felony, theft, or assault."). Florez acknowledges that sufficient evidence exists to support the conclusion that he was attempting to enter Victim's house, but asserts that the State presented insufficient evidence that he was attempting to enter the house with the specific intent to accomplish any of the nefarious acts listed in the burglary statute.[3] *See* Utah Code Ann. § 76-6-201(1).

---

3. The State asserts that Florez failed to preserve his challenge to the trial court's denial of his directed verdict motion. The State correctly points out that Florez's oral motion consisted of one rather vaguely-worded statement that did not mention the lack-of-specific-intent argument he now raises on appeal. Had the trial court offered a simple one-word denial of the motion, we might be inclined to agree with the State's position on preservation. But that is not what happened. In this instance, the trial court appeared to somehow understand that Florez's motion was aimed at the intent issue, and specifically ruled that the State had presented sufficient evidence from which "a jury

(continued…)

¶18 "When specific intent is an element of a crime, prosecutors must prove that intent beyond a reasonable doubt." *State v. Carrell*, 2018 UT App 21, ¶ 57, 414 P.3d 1030. But the State is not required to prove specific intent through direct evidence, which is often hard to come by. *See State v. Robertson*, 2005 UT App 419, ¶ 15, 122 P.3d 895 (stating that intent is a "state of mind, which is rarely susceptible of direct proof"). Indeed, we have made clear that intent "need not be proved by direct evidence but may be inferred from the actions of the defendant or from surrounding circumstances," and "can be inferred from conduct and attendant circumstances in the light of human behavior and experience." *See Carrell*, 2018 UT App 21, ¶ 57 (quotation simplified). "When the mental state is proven by circumstantial evidence, we examine whether the State presented any evidence that the defendant had the requisite intent or knowledge," as well as "whether the inferences that can be drawn from that evidence have a basis in logic and reasonable

---

(…continued)

could infer that" Florez's "intent . . . to try to get into the residence was to take something or to do something other than commit a misdemeanor offense." As our supreme court has stated, the main point of our preservation rules is to afford a trial court the opportunity to rule on a disputed issue, and where a trial court actually makes a ruling on an issue, it has had that opportunity. *See Helf v. Chevron U.S.A., Inc.*, 2015 UT 81, ¶ 42, 361 P.3d 63 (stating that, "[w]here a [trial] court itself raises and then resolves an issue sua sponte, it obviously had an opportunity to rule on the issue," and these circumstances "satisf[y] the basic purposes of the preservation rule"); *see also Kell v. State*, 2012 UT 25, ¶ 11, 285 P.3d 1133 (holding that an issue was preserved for appeal when "the [trial] court not only had an opportunity to rule on the issue . . . [but] it did rule on it"). Under the circumstances presented here, we conclude that the lack-of-intent issue was preserved for appellate review.

human experience sufficient to prove that the defendant possessed the requisite intent." *State v. Maestas*, 2012 UT 46, ¶ 179, 299 P.3d 892 (quotation simplified).

¶19 In burglary cases specifically, our supreme court has stated that "burglarious intent is a mental state of the actor," and that "the trier of fact must resort to reasonable inferences based upon an examination of the surrounding circumstances to reasonably infer its existence." *See State v. Porter*, 705 P.2d 1174, 1177 (Utah 1985) (quotation simplified). However, this inference must be based on something more than merely a defendant's entry (or attempted entry) into a building. *See Johnson*, 771 P.2d at 1073 (stating that "the act of entering alone does not give rise to an inference that the actor entered with the requisite intent to constitute burglary" (quotation simplified)).

¶20 "Intent with which an entry is made is rarely susceptible of direct proof. It is usually inferred from circumstantial evidence: the manner of entry, the time of day, the character and contents of the building, the person's actions after entry, the totality of the surrounding circumstances, and the intruder's explanation." *Porter*, 705 P.2d at 1177; *see also Johnson*, 771 P.2d at 1073 (concluding that a jury can reasonably infer the requisite intent from a defendant's unauthorized presence in the bedroom of an apartment, the fact that a jewelry box had been "disturbed and that the lid was open," and the fact that the defendant volunteered that he was "looking for a friend" but could not provide police with an address where any such friend resided); *State v. Sisneros*, 631 P.2d 856, 859 (Utah 1981) ("When one breaks and enters a building in the nighttime, without consent, an inference may be drawn that he did so to commit larceny."); *Robertson*, 2005 UT App 419, ¶ 16 (concluding that a jury can infer the requisite intent from a defendant's unauthorized presence on the victim's premises, evidence of forced entry, and the defendant's subsequent flight from the scene).

¶21    Florez argues that the circumstantial evidence, even including the inferences that could be drawn therefrom, is insufficient to support a conclusion that he was attempting to enter Victim's house to commit a felony, assault, theft, or sex crime. Though Florez acknowledges that he broke Victim's sprinkler head and poked a wire into her backdoor lock, he notes that he ultimately stepped away from the door of his own volition, and asserted several times that the house was his. Florez also points out that the incident occurred in broad daylight, and that he did not say anything indicating that he meant Victim any harm.

¶22    In response, the State notes that Florez was using a burglary tool—a wire he had broken off of the sprinkler—to try to break into the house, and that he persisted in trying to pick the lock even after Victim and Neighbor each confronted him and told him to leave. The State points out that, at least by this point, Florez knew the house was not his, and that its occupant was an elderly woman. The State acknowledges that Florez was making his attempt in broad daylight rather than under cover of darkness, but points out that Florez chose to use Victim's back door rather than her front door, a choice that may imply a desire to remain unseen. In short, the State asserts that "a jury could reasonably infer from [Florez's] persistence in jimmying the locked door, even after [Victim] confronted him, that he intended to do more than merely annoy her," and that his "persistence was itself threatening and that he viewed [Victim] as easy prey for more serious criminality."

¶23    We take Florez's point that the State's evidence of intent is perhaps weaker than the evidence the State is sometimes able to present in other burglary cases. *See, e.g., Johnson*, 771 P.2d at 1073; *State v. Baer*, 2019 UT App 15, ¶¶ 9–11, 438 P.3d 979 (affirming the denial of a directed verdict motion on a burglary charge for an unlawful entry into a public swimming pool, noting, among other things, that the event occurred after hours

and that the defendant made off with a lockbox full of cash); *State v. Harris*, 2015 UT App 282, ¶ 10–12, 363 P.3d 555 (affirming the denial of a directed verdict motion on a burglary charge, noting that, when he was arrested, the defendant was found in possession of burglary tools, a piece of glass from the window of the burgled store, and several items consistent with the inventory of the store). But our supreme court has affirmed a burglary conviction in at least one case in which the evidence of burglarious intent was not all that different from the evidence present here. In *Sisneros*, the defendant entered a business at night by breaking a window, and was later discovered in the company president's office "standing against a wall as if he were hiding"; a drawer in a secretary's desk was open. *Sisneros*, 631 P.2d at 857. Upon being discovered, the defendant "shouted profanities" and that "a revolution was coming," and threatened that he would kill certain people. *Id.* Arresting officers found no indication that any property was missing, but noticed that the defendant "seemed to be under the influence of alcohol." *Id.* at 857–58. After being charged with burglary, the defendant argued—as Florez does here—that insufficient evidence existed to show burglarious intent. *Id.* A jury convicted him of burglary, and our supreme court affirmed, focusing on the surreptitious nature of the entry, and stating that "[w]hen one breaks and enters a building in the nighttime, without consent, an inference may be drawn that he did so to commit larceny." *Id.* The court also emphasized that it was "no defense" to say that "nothing was missing" from the premises, and concluded that, "[o]n the facts of this case, the jury could reasonably infer that defendant entered the building for the purpose of theft." *Id.* at 859.

¶24    As in *Sisneros*, the jury could have reasonably inferred, on the facts of this case, that Florez was attempting to enter Victim's home for a burglarious purpose. That is, in our view there is at least "some evidence" upon which a jury could find burglarious intent beyond a reasonable doubt. *Salgado*, 2018 UT App 139, ¶ 30. Even though Florez did not attempt his entry at night, he

did attempt it in a backyard, outside the view of people passing on the street; there is therefore some evidence of surreptitiousness. And while Florez was not found in possession of more typical burglary tools, he was caught using a wire implement to try to jimmy the lock on the storm door. And perhaps most significantly, he also persisted in his efforts to gain access to Victim's house, even after learning that the occupant of the house was an elderly woman, and even after Victim and Neighbor both confronted him and Victim told him to leave.[4]

¶25   We acknowledge that there is evidence from which a jury might have drawn a different inference. Florez appeared to be intoxicated, making implausible claims about federal agents and owning Victim's house, and did not actually succeed in gaining entry. Other than the broken sprinkler head and minor damage to the storm door's lock, none of Victim's property was taken or damaged. Florez said nothing that would indicate that he intended to harm Victim. And before Officer arrived, Florez had already stepped away from the storm door, backed down the patio steps, and put his hands on his head. But many of these countervailing factors were also present in *Sisneros*: in that case,

---

4. Citing out-of-state case law, *see Gebhart v. State*, 531 N.E.2d 211 (Ind. 1988), Florez attempts to draw a distinction between completed burglary cases and attempted burglary cases, asserting that "intent is harder to infer in attempted burglary cases." We take Florez's point that, where entry into the building has not been completed, evidence of burglarious intent may be less compelling than otherwise because the defendant did not actually carry out that intent. But the absence of a completed entry does not necessarily render other evidence of intent insufficient. Regardless of whether entry has been completed, we are to examine the "totality of the surrounding circumstances," *State v. Porter*, 705 P.2d 1174, 1177 (Utah 1985), which we here find sufficient to support an inference of burglarious intent.

the defendant appeared intoxicated and was making implausible claims about "revolution"; the defendant was discovered just standing in a room as if he were hiding; and other than the broken window, no property was taken or damaged. *Sisneros*, 631 P.2d at 857–58.

¶26 On balance, after examining the totality of the circumstances, we conclude that the State's case, while not overwhelming, was sufficient to satisfy the applicable standard of review. Because there was "some evidence" upon which a jury could have found burglarious intent beyond a reasonable doubt, we conclude that the court committed no error in denying Florez's directed verdict motion.

II

¶27 Florez next asserts that the trial court erred by rejecting his request for a lesser-included-offense instruction for criminal trespass on the attempted burglary charge. This instruction, if given, would have allowed the jury to select between attempted burglary and criminal trespass (as a class A misdemeanor) on the attempted burglary count. But under the circumstances, we cannot fault the trial court for failing to give a lesser-included-offense instruction, because Florez did not alert the court to the issue he now complains about on appeal. Florez's challenge is therefore unpreserved.

¶28 Under Utah law, a defendant is "entitled to a lesser-included-offense instruction when: (1) the two offenses are related because some of their statutory elements overlap, and the evidence at trial of the greater offense involves proof of some or all of those overlapping elements; and (2) the evidence provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting the defendant of the lesser-included offense." *See State v. Kell*, 2002 UT 106, ¶ 23, 61 P.3d 1019 (quotation simplified); *see also State v. Baker*, 671 P.2d 152,

158–59 (Utah 1983) (interpreting section 76-1-402 of the Utah Code and distilling the two-part test cited in *Kell*).

¶29    With respect to the first part of the test, the trial court acknowledged sufficient overlap between the elements of burglary and criminal trespass, and the State concedes this point on appeal. *See, e.g.*, *State v. Neeley*, 748 P.2d 1091, 1095 (treating criminal trespass as a lesser-included offense of burglary); *Baker*, 671 P.3d at 159–60 (same). We therefore proceed to the second part of the test: whether a rational basis exists in the evidence for acquitting Florez of attempted burglary but convicting him of criminal trespass. *See Kell*, 2002 UT 106, ¶ 23.

¶30    Florez made a timely motion for a lesser-included-offense instruction on the attempted burglary charge, and the trial court heard argument on that motion during trial, outside the presence of the jury, after each side had rested its case. During that discussion, the trial court acknowledged that the elements of the two crimes overlapped, and noted Florez's defense that "he was trying to get into [the] home because he believed it was his residence," and posited that this argument "raises a quantum of proof that would allow a lesser-included charge for attempted criminal trespass of a dwelling." Accordingly, the court appeared ready to grant Florez's motion.

¶31    But the State made additional argument, and pointed out that Florez's defense—that he believed Victim's house was actually his own—would not provide the necessary "rational basis" in the evidence for the requested instruction, because that defense, if believed, would absolve Florez of both crimes, and would not provide an evidentiary pathway for Florez to be acquitted of attempted burglary but convicted of criminal trespass. In response, Florez's counsel acknowledged that the "I thought it was my house" defense was Florez's chief defense, and he mentioned no other; specifically, counsel did not point to any evidence supporting the notion that Florez knew the house

was not his but that he intended to enter it for a non-felonious purpose (such as to annoy the occupants). Earlier that day, in cross-examination of Officer, Florez's counsel had attempted to introduce evidence of other "events" that occurred on the same morning as the attempted break-in of Victim's house, but had been unable to procure admission of that evidence. In short, during the discussion on the jury instruction motion, Florez did not argue that he might have had criminal intent sufficient to support a conviction for criminal trespass, but insufficient to support a conviction for attempted burglary; indeed, even when essentially invited to do so, Florez did not articulate for the court any argument along these lines. Given Florez's failure to point to any evidence, or even articulate a defense, that might fit the facts necessary to support a lesser-included-offense instruction, the trial court "chang[ed its] ruling" and denied Florez's request for such an instruction.

¶32   On appeal, Florez points out that, during the closing argument that followed the jury instruction conference, his trial counsel did assert that "circumstantial evidence suggests that [Florez's] actions would have been to annoy, not to assault, assert he was a federal agent, not to steal, not commit a felony or any other action that would constitute a burglary." But Florez did not make this argument during the jury instruction conference, when the trial court was considering the question of whether to give the requested lesser-included-offense instruction; by the time Florez's counsel made this argument during closing, the jury had already been instructed. And Florez's counsel did not renew his request for a lesser-included-offense instruction after making his closing argument.

¶33   As we previously explained, the primary purpose of our preservation requirements is to "put the [trial] court on notice of an issue and provide it with an opportunity to rule on it." *Donjuan v. McDermott*, 2011 UT 72, ¶ 20, 266 P.3d 839 (quotation simplified). When a party asks a trial court to take an action

based on a particular legal theory, that party has preserved for appeal only the theory raised; that party will not be allowed, on appeal, to assign error to the trial court's ruling based on a different legal theory. *See State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (stating that, "if a party makes an objection at trial based on one ground, this objection does not preserve for appeal any alternative grounds for objection"); *see also State v. Sanchez*, 2018 UT 31, ¶¶ 31–32, 422 P.3d 866 (at trial, the defendant attempted to win admission of certain statements, and articulated "four separate theories of admissibility" in support of his efforts, but did not assert any constitution-based theory; on appeal, the constitutional theory was deemed unpreserved); *In re D.V.*, 2011 UT App 241, ¶ 9, 265 P.3d 803 (at trial, a party objected to the admission of certain evidence on hearsay grounds; on appeal, the party asserted a different theory—inapplicability of the governing rule—and that theory was held unpreserved).

¶34 In this case, the trial court stated its perception of what Florez's chief defense theory was—that he thought the house was his—and proceeded to analyze the "rational basis" part of the lesser-included-offense instruction test with that defense in mind. At no point during the jury instruction conference did Florez tell the court that he intended to articulate a different defense theory, or that the court was misperceiving the way in which he was defending the case. Based on that information, the court then made its ruling and instructed the jury. And after he articulated something of a different theory during closing argument, Florez did not renew his request for the instruction.

¶35 Under such circumstances, we cannot fault the trial court for making the ruling it made, and we consider unpreserved the issue Florez now seeks to raise on appeal. And because Florez does not ask us to analyze this issue for plain error or for ineffective assistance, we do not consider it further. *See State v. Hodges*, 2002 UT 117, ¶ 5, 63 P.3d 66 ("Because defendant has not asserted either of the exceptions to the general rule—plain error

or exceptional circumstances—we decline to address [his claims].”); *State v. Soules*, 2012 UT App 238, ¶ 8, 286 P.3d 25 (stating that, where the defendant “does not assert plain error or exceptional circumstances[,] . . .we do not address the merits” of the claim).

III

¶36   Finally, Florez asks us to consider his motion, filed pursuant to rule 23B of the Utah Rules of Appellate Procedure, in which he seeks an order remanding this case to the trial court for supplementation of the record regarding a separate possible claim of ineffective assistance of counsel, this one potentially affecting his conviction for attempted burglary. Specifically, Florez intends to argue that his trial counsel was ineffective for failing to call witnesses to provide first-hand accounts of the “events” that occurred on the same Christmas Eve morning, in which an individual—suspected to be Florez—entered into at least two other houses in Victim’s neighborhood, asked if the occupants were “the feds,” and then voluntarily left the premises. Florez maintains that introduction of evidence regarding these other events would have improved his case in several ways, including (a) providing support for the notion that his intent in attempting to enter Victim’s house was not felonious or burglarious, but rather was simply to inquire about “the feds”; and (b) providing a rational basis upon which a jury could have acquitted him of attempted burglary and instead convicted him on that count of the lesser-included offense of class A criminal trespass of a dwelling.

¶37   A movant must make a four-part showing in order to obtain a remand order under rule 23B. First, the rule 23B motion “must be supported by affidavits setting forth facts that are not contained in the existing record.” *State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719 (quotation simplified). Second, the affidavits must contain “allegations of fact that are not

speculative." *Id.* (quotation simplified). Third, the allegations contained in the affidavits "must show deficient performance by counsel." *Id.* (quotation simplified). And finally, the affidavits "must also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* (quotation simplified). Importantly, the third and fourth elements require the defendant to "present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Gallegos*, 2018 UT App 192, ¶ 23, 437 P.3d 388 (quotation simplified), *aff'd*, 2020 UT 19. "[I]f the defendant could not meet the test for ineffective assistance of counsel, even if his new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3d 1166. Florez has satisfied these elements here.

¶38   By supporting his motion with affidavits containing nonspeculative allegations of fact that are not currently in the record, Florez has met the first two elements of the test. Florez's motion is supported by two sworn statements, one from an attorney-investigator and one from Witness, who told the investigator he would be willing to testify if necessary. In his affidavit, the investigator explains that he set out to learn more about the events described in Officer's police report, and that he "decided to interview residents of the area" in Victim's neighborhood where these events were supposed to have taken place, and that he "knocked on houses" in an effort to obtain information. At one of the houses, Witness answered the door, and eventually gave the investigator a sworn declaration attesting that, on the same morning as the events of this case, a man who appeared to be "on drugs" knocked on Witness's front door. The man "start[ed] yelling, asking [Witness] if [he] was 'the feds,'" and then "left the house" after a few minutes. Witness then observed the man go to a nearby house, where he "did not knock or ring their doorbell; he just barged in" and

started "yelling at the neighbor if they were the feds." After less than a minute in the neighbor's house, the man "ran out," then "loiter[ed] in the middle of [the] street for about 30 to 45 seconds," then "took off and ran down the street." Witness then spoke with the occupants of the other house, who reported to him, consistent with his own observations, that "a crazy guy [had] entered their home, asked [the neighbors] if they were the feds, and left." Officer soon arrived, but the man was gone by then, and Witness told Officer what had happened. Officer recorded Witness's version of events in his police report.

¶39     The facts set forth in these statements are not speculative, and none of them are in the record. Florez's trial counsel attempted to ask Officer about the events in question, but the court sustained the State's hearsay objection, and therefore the jury did not hear much about these events. Neither Witness nor any other percipient observer testified about these events, and Officer was prevented from telling the jury anything more than the fact that there were some other "events" that took place that morning and that Florez was considered a suspect in them. We think Florez is correct when he asserts that this evidence could have been helpful to his cause. If the jury had learned that an individual—suspected to be Florez—had been barging into other houses in the neighborhood that same morning only to ask if the occupants were "the feds" before leaving of his own accord after just a minute or two, the jury may well have been more inclined to credit Florez's argument, specifically made during closing argument, that Florez had no burglarious intent but, instead, was entering the houses for a more benign purpose (such as annoyance, or crazily asking about "the feds"). Had the jury credited that argument, it could have been more inclined to acquit Florez of attempted burglary. And had this evidence been admitted at trial, Florez's counsel would have been much better positioned to argue for a lesser-included-offense instruction on the attempted burglary count.

¶40    We must next consider whether these facts could support a claim that Florez's trial counsel rendered ineffective assistance. *See Norton*, 2015 UT App 263, ¶ 6. In order to assess whether this evidence, if added to the record, could support a claim for ineffective assistance, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984): Florez must be able to demonstrate (1) that his counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 669, 687–88; *see also State v. Ray*, 2020 UT 12, ¶ 24; *State v. Scott*, 2020 UT 13, ¶ 28.

¶41    To determine whether counsel's performance was deficient under the first part of the test, we apply "the deficiency standard announced in *Strickland*" and ask whether counsel's actions "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified); *see also Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 ("To prevail, a defendant must show . . . that his counsel rendered a deficient performance in some demonstrable manner," and that counsel's "performance fell below an objective standard of reasonable professional judgment." (quotation simplified)). One factor courts examine, in evaluating whether an attorney performed deficiently, is whether the attorney had a strategic reason for taking the action in question. *See Scott*, 2020 UT 13, ¶ 35 (stating that "the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions"). If the court determines that the attorney had a valid strategic reason for his actions, then "it follows that counsel did not perform deficiently." *Id.*; *see also State v. Ray*, 2020 UT 12, ¶ 34 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.").

¶42    But our supreme court has recently clarified that, despite some language to the contrary in prior cases, the "converse is not true." *State v. Ray*, 2020 UT 12, ¶ 34. A court's determination that an attorney did *not* have a valid strategic reason for his actions does not automatically lead to the conclusion that the attorney performed deficiently. *Id.*; *see also Scott*, 2020 UT 13, ¶ 36 ("[E]ven where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient"). In that situation, the court still must "ask whether, in light of all the circumstances, the attorney performed in an objectively reasonable manner." *Ray*, 2020 UT 12, ¶ 34; *see also Scott*, 2020 UT 13, ¶ 36 ("[E]ven if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable.").

¶43    In evaluating prejudice under the second part of the test, we assess whether there exists a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently. *See Garcia*, 2017 UT 53, ¶¶ 34–38. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing whether a defendant has met this standard, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Garcia*, 2017 UT 53, ¶ 28 (quotation simplified).

¶44    In applying this two-part test, we first examine whether Florez's counsel might be found to have rendered deficient performance by not introducing admissible evidence of the other events. In this case, at least on the record before us, we discern no strategic reason for a reasonable attorney to have chosen not to introduce testimony about the events in question. Certainly, Florez's counsel was not operating on the basis of any such

strategic motivation; indeed, during his cross-examination of Officer, he actively tried to present evidence of the events in question, but was thwarted by the State's hearsay objection. And nothing in the record, or in the materials submitted in connection with the rule 23B motion, suggests that placing Witness on the stand would have carried any downside risk—Witness is a disinterested third party with no apparent credibility problems or disqualifying biases.

¶45 The State asserts that counsel could have determined, for several reasons, that Witness would not be helpful: in his declaration, Witness does not specifically identify Florez as the person who entered his house; and there are some differences between the actions Florez took at Victim's house and those the unidentified man took at Witness's house, including the door through which entry was gained. But we find these arguments unconvincing. Officer had already stated that Florez was a suspect in the other events, and was working on the assumption that Florez was involved. The record contains no information tending to indicate that the man who entered Witness's house did not look like Florez. And even though there were some differences between the invasion of Witness's house and the attempted break-in of Victim's, the other events would have given counsel the very thing he was lacking during the arguments on the lesser-included-offense instruction: evidence that Florez was trying to gain entry for a non-felonious but still unlawful purpose.

¶46 Under these circumstances, we discern no plausible strategic purpose, on this record, for counsel's failure to present Witness's testimony. But as noted, this is not the end of the inquiry. *See Ray*, 2020 UT 12, ¶ 36. We must also consider whether the evidence Florez now wishes to present could support a conclusion that his attorney acted in an objectively unreasonable manner. And we conclude that it could.

¶47 We are persuaded that the evidence to which Florez points could support a conclusion that his attorney acted unreasonably, and therefore performed deficiently, by not presenting Witness's testimony. Based on his knowledge of the police report, Counsel was aware of the existence of other individuals whose houses had been entered on that same morning, yet he did not call any of them to testify. Given the importance of this evidence to any efforts to gain acquittal—or at least a reduction from a felony to a misdemeanor—on the main charge against Florez, we conclude that this evidence could lead to the conclusion that Florez's counsel acted in an objectively unreasonable manner.

¶48 And with regard to prejudice, we conclude that Florez has made the required showing. As discussed above, the State's evidence regarding Florez's burglarious intent was not overwhelming. Witness's testimony—especially coupled with a lesser-included-offense instruction, which Florez would have been likely to get if Witness had testified—could have made a real difference in the jury's ultimate assessment of Florez's intent. This evidence could have made a jury more likely to believe that Florez's intent, in attempting to enter Victim's house, was merely to annoy her or inquire about "the feds," rather than to steal something or assault her. And that determination, in turn, could have led to Florez being convicted only of misdemeanors, rather than of a felony. We conclude that Witness's testimony could lead to a determination that there exists a reasonable probability of a different outcome, had Witness's testimony been presented to the jury.

¶49 Accordingly, we conclude that Florez has met all of the requirements of rule 23B, and we therefore grant his motion, and remand this case to the trial court for further proceedings in connection with Florez's ineffective assistance claim.

CONCLUSION

¶50    We conclude that the trial court did not err in denying Florez's motion for directed verdict on the attempted burglary count, and did not err in denying Florez's request for a lesser-included-offense instruction on that count. However, we grant Florez's rule 23B motion, and remand this case to the trial court to supplement the record as appropriate to resolve his claim that his trial attorney rendered ineffective assistance by failing to call witnesses who could have provided first-hand accounts of the other events that occurred on the same Christmas Eve morning.

———————